IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 08 CR 153 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| PAUL PORTER ) | |

**DEFENDANT'S MOTION FOR CLARIFICATION OF BOND**

Defendant PAUL PORTER, by the Federal Defender Program and its attorney ALISON SIEGLER, respectfully requests that this Court clarify the bond in the instant case by denying the government's motion to vacate the Honorable Nan R. Nolan's bond order, because there are conditions of release that will reasonably assure Mr. Porter's appearance and the safety of the community.[1] In support of this motion, Mr. Porter states as follows:

**I.    BACKGROUND**

On March 6, 2008, the Honorable Nan R. Nolan ordered Paul Porter released on an unsecured $4500 bond cosigned by LaDalle Mitchell (his girlfriend and the mother of his child) on the condition that he enter the Gateway Foundation's inpatient treatment facility. Although Gateway did not have bed space available at that time, they had agreed to admit Mr. Porter when a bed became available, and had agreed to pick Mr. Porter up from the MCC and transport him directly to the facility at that time.

Judge Nolan made numerous factual findings regarding the factors addressed in 18 U.S.C. § 3142(g). Judge Nolan first correctly noted: "Under the [Bail Reform Act] the defendant must be released prior to trial unless a judicial officer finds that no conditions or combination of conditions exist which will reasonably assure the appearance of the defendant or which will

---

[1] This motion reiterates arguments made in Defendant's response to the government's motion to revoke Judge Nolan's order, and also makes additional arguments. Accordingly, there is no need to review Defendant's response in deciding this motion.

1

reasonably assure the safety of any other person in the community. The Act requires that the least restrictive conditions be imposed that are necessary to provide those reasonable assurances." Tr. at 5, l. 19-24 (transcript attached). Judge Nolan proceeded to discuss the facts that she believed warranted release, including that Mr. Porter "has very significant family ties here." Tr. at 7, l. 6-7. She noted that Mr. Porter has "a long history of mental illness," and "told us here in court that he would like more help" with his dual diagnosis of drug addiction and mental illness. Tr. at 7, l. 9-10, 19-20.

Judge Nolan then spoke about her experience with the Gateway program and explained that it was "a wonderful program" but also "a real tough love program." Tr. at 8, l. 13-19. She elaborated: "They are very strict, and you have got to obey all their conditions." Tr. at 15, l. 10-11. She also stated that our pretrial facilities do not provide adequate mental health and drug treatment (tr. at 8, l. 4-7), a fact that is relevant to Mr. Porter's physical and mental condition and his drug abuse history under § 3142(g)(3)(A). In addition, Judge Nolan noted that *United States v. Gall* is important to the bond determination "because district courts now can consider many mitigating things that they couldn't consider before . . . ." Tr. at 7, l. 23-25 & 8, l. 1-3.

Judge Nolan concluded that the conditions of release would reasonably assure Mr. Porter's appearance in court. In support of this conclusion, she cited the fact that Mr. Porter is a Chicago native with family ties to this community who "has absolutely no funds, no funds, probably no resources" to leave this area. Tr. at 9, l. 16-17. She accurately noted that Mr. Porter had not been convicted of any crime between 2006 and 2008. Tr. at 7, l. 15. Although the government pointed out that Mr. Porter spent time in the Department of Corrections in 2006 (tr. at 9, l. 9-10), it is clear that Mr. Porter was released in September 2006 and successfully completed his year-long parole term.

Judge Nolan also determined that the government had not proved by clear and convincing evidence that there were *no conditions* of release that would reasonably assure the safety of the community. Tr. at 10, l. 6-9. She determined, in the exercise of her discretion and in light of her

experience with the Gateway program, that placement in Gateway would reasonably assure the safety of the community.

Judge Nolan imposed additional conditions of release beyond ordering Mr. Porter to undergo inpatient treatment at Gateway. She ordered his girlfriend, Ms. Mitchell, to cosign the $4500 bond and to be Mr. Porter's third-party custodian, and she admonished Ms. Mitchell about her responsibilities. Tr. at 12-13. Ms. Mitchell assured the Court that she did not think Mr. Porter would run away. Tr. at 16, l. 7-8.

After the conclusion of the bond hearing but before bed space became available at Gateway, the government filed a motion to vacate Judge Nolan's release order with the Emergency Judge. On March 12, 2008, Judge Pallmeyer, acting as Emergency Judge, entered and continued the government's motion, and stating: "The court will entertain a proposal for defendant's release that includes a secured property bond . . . ."

## II. LEGAL STANDARD

As the Supreme Court held in *United States v. Salerno*, 481 US 739, 755 (1987), "In our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." This presumption of release is encapsulated in the bail statute, 18 U.S.C. § 3142. Congress's purpose in enacting the Bail Reform Act of 1984 was to detain a "small but identifiable group of particularly dangerous defendants."[2] Accordingly, the statute states that the Court "shall order" pretrial release, 18 U.S.C. § 3142(b), except in certain narrow circumstances. Even if the Court determines under 18 U.S.C. § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further conditions," that will "reasonably assure," not definitively guarantee, the defendant's appearance at court and the safety of the community. 18 U.S.C. § 3142(c)(1). There is no presumption of detention in a bank robbery case. *See* 18 U.S.C. § 3142(e). To detain a defendant, the government must prove by a preponderance of the

---

[2] *See* David N. Adair, Jr., "Looking at the Law," *Federal Probation* at 74 (Washington, D.C. March 1993).

evidence that there is no combination of conditions that will reasonably assure a defendant's appearance, or must prove by clear and convincing evidence that there is no combination of conditions that will reasonably assure the safety of the community. 18 U.S.C. § 3142(e), (f).

### III. Placement at Gateway Will Reasonably Assure Paul Porter's Appearance in Court and the Safety of the Community.

Mr. Porter has strong ties to the community. He has lived in this area for much of his life and has been here steadily for the past nine years. His mother, father, and sister all live in the area, as does his girlfriend Ms. Mitchell. Ms. Mitchell is nearly forty years old and is a bus driver for the Chicago Transit Authority. As reflected in the Pretrial Services Report, she has no criminal history. Mr. Porter also has two children who live in Chicago with whom he has regular contact.

Mr. Porter has undergone inpatient treatment at the Gateway Foundation in the past, and responded very well to that treatment. He entered voluntarily and complied with treatment. In retrospect, it appears that he was released into the community too soon, and would have benefitted from remaining in a structured treatment setting. Gateway has informed Pretrial Services that they have accepted Mr. Porter back into the inpatient treatment program, and are willing to pick him up from the MCC and transport him to Gateway as soon as bed space becomes available.

Undersigned counsel has spoken at length with Jacqueline Seaton, the Clinical Supervisor of Gateway's L-Star Program. The L-Star Program is a Mental Illness and Substance Abuse (MISA) program that focuses on psychoeducational treatment for people like Mr. Porter who suffer from a dual diagnosis. Ms. Seaton states that Mr. Porter did well at Gateway, remained drug-free during his stay, and was fully compliant with his medications. The reports attached to Mr. Porter's previous submission demonstrate how well he adjusted to treatment. *See* Defendant Paul Porter's Response to the Government's Motion to Vacate the Release Order, Attachment 1. Ms. Seaton would like Mr. Porter to return to Gateway, and she has no doubt that he will be compliant with treatment. She also explains that if Mr. Porter again completes the inpatient

portion of the program, he may be placed into one of Gateway's recovery homes, which are structured living and treatment facilities with 24-hour staff where Mr. Porter could live for an extended period of time.

Undersigned counsel has also spoken with Peter Harding, Intake Coordinator for Thresholds Rowan Trees branch, located at 500 W. Engleside. (Thresholds is one of the country's largest non-profit providers of mental health services.) Mr. Harding has explained that Mr. Porter has lived at Thresholds for over a year in the past and is welcome to live there again in the future. If Mr. Porter is placed into the Gateway treatment program, he could live at Thresholds when his treatment is complete as an alternative to living in a Gateway recovery home. Mr. Harding also stated that Mr. Porter was employed by Urban Metals Florists, a non-profit flower company run by Thresholds that employs the mentally ill to deliver flowers in the Chicago area. According to Mr. Harding, Mr. Porter did very well at his job and did not have any problems. Unfortunately, Mr. Porter was informed that he could not maintain his job and also continue to receive SSI. Because Mr. Porter needed the SSI to cover his medical care, he was required to cease working.[3]

In addition, Mr. Porter suffers from a medical condition that can best be treated outside of the Metropolitan Correctional Center. In 1999, he was diagnosed with full-blown thyroid cancer and underwent surgery to remove his thyroid gland. The cancer has recurred multiple times since then. He recently had an abnormal test which indicated that the cancer may have recurred again. He had an appointment with an endocrinologist scheduled for March 3, 2008, which he was unable to attend as a result of his arrest and incarceration. He has lost over 10 pounds since he

---

[3] While it is expected that Mr. Porter would continue living in some type of recovery or treatment facility after his release from Gateway, if such a facility were not available, Ms. Mitchell has agreed that Mr. Porter can live with her. At the March 12, 2008, hearing before Judge Pallmeyer, Ms. Mitchell stated that Mr. Porter could even accompany her on her bus route, because he has his own bus pass. While Judge Pallmeyer expressed some skepticism about whether Mr. Porter would be allowed to ride Ms. Mitchell's bus all day, Ms. Mitchell has informed counsel that the CTA does not discriminate against people based on mental illness, and that anyone with a bus pass can ride the bus.

has been incarcerated.

### A.    The Safety of the Community

The government cannot carry its burden of proving by clear and convincing evidence that placing Mr. Porter in Gateway's inpatient treatment program would not reasonably assure the safety of the community. The Seventh Circuit has emphasized that "[a] defendant cannot be detained as dangerous . . . unless a finding is made that no release conditions '*will* reasonably assure . . . the safety of the community.'" *United States v. Dominguez*, 783 F.2d 702, 706-07 (7th Cir. 1986) (emphasis in original).[4] The Seventh Circuit has held that "[t]his finding cannot be based on evidence that [the defendant] has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct." *Id.* at 707.

Mr. Porter's past conduct at Gateway and Thresholds suggests just the opposite, specifically, that it is not likely that he will engage in future misconduct while in a structured treatment setting. Ms. Seaton of Gateway reports that Mr. Porter was "a cooperative, easy guy" who "got along well with others" and "engaged in therapy well." She called him "really a decent guy; very respectful and cooperative," and said he was "one of our more pleasant clients." Given her experience with him, she does not believe he will pose a danger to the community while at Gateway. Mr. Harding of Thresholds echoed Ms. Seaton's comments. Having worked closely with Mr. Porter for over a year, Mr. Harding explains that he "never saw [Mr. Porter] act dangerous at all." He calls Mr. Porter "a good person" who is "motivated to do good things." He says that Mr. Porter does well with treatment and structure.

The circumstances of this case do not demonstrate by clear and convincing evidence that placement at Gateway will not reasonably assure the safety of the community. According to the government's description of the offense, Mr. Porter admitted that he was drunk. He was

---

[4] It should be noted that *Dominguez* was a presumption case, and therefore the release standard in *Dominguez* was far more stringent than the release standard that applies to cases such as this one, in which the presumption of detention in § 3142(e) does not apply.

apparently so drunk that he could not communicate with the agents after the arrest.  Mr. Porter remained completely sober during his last stay at Gateway, a good indication that Gateway can successfully treat the problem that lies at the heart of the alleged offense.  According to Ms. Seaton and Mr. Harding, Mr. Porter is not a remotely dangerous person when he is sober.

It is clear that Mr. Porter's dual diagnosis of mental illness and drug addiction lie at the root of his past criminal history.  Treatment will assure in the future, as it has in the past, that Mr. Porter does not pose a danger or a threat to anyone.

### B.     Appearance in Court

The government also has not carried its burden of proving that placing Mr. Porter in Gateway's inpatient treatment program would not reasonably assure his appearance in court. While the Bail Reform Act requires that the Court impose "the least restrictive further condition" that will assure appearance and safety, placement in "a specified institution" for the purposes of undergoing "medical, psychological, or psychiatric treatment, including treatment for drug or alcohol dependency" is one of the strictest bond conditions available.  18 U.S.C. § 3142(B)(x) (listing conditions in order, from least restrictive to most restrictive, and designating the condition of treatment to be the tenth of thirteen specified conditions).

The government contends that Mr. Porter might walk away from Gateway because it is not a locked facility, but has presented no evidence that Mr. Porter himself has ever left a treatment program, and no evidence that defendants on bond regularly walk away from treatment. In fact, Pretrial Services' 2007 Annual Report states that only 1.2% of the defendants release on bond last year absconded.  Ms. Seaton of Gateway reports that she cannot recall anyone on bond, parole, or probation leaving Gateway in the last year.  In addition, Ms. Seaton states that Gateway transports clients who are on bond to and from court.  Mr. Porter will not be allowed to leave Gateway for any reason during his treatment, and the absence of a patient would be quickly noticed and responded to.

There is every indication that Mr. Porter is someone who can comply with rules and laws

when he is in a structured setting in which his mental illness is being properly treated. Mr. Porter successfully completed his year-long parole term during the time that he was living at Thresholds in 2006 and 2007. Moreover, Ms. Seaton and Mr. Harding both report that Mr. Porter enjoyed receiving treatment in a structured setting, and neither is concerned that Mr. Porter would leave treatment.

Finally, given Mr. Porter's ties to the community, there is no evidence that he is at risk to leave the jurisdiction; his ties here are simply too strong, and although he has lived elsewhere in the past, he has no family or relationship ties elsewhere. As Judge Nolan observed, Mr. Porter has nowhere to go.

**IV.   It Would Be Improper to Require Mr. Porter to Post Property or Money As Security For His Bond.**

The Bail Reform Act explicitly states that "the judicial officer may not impose a financial condition that results in the pretrial detention of the person." 18 U.S.C. 3142(c)(2). Requiring Mr. Porter to post property or money as security for his bond would be imposing a financial condition that he cannot meet. That financial condition would therefore result in his pretrial detention, in violation of the bond statute.

WHEREFORE, Paul Porter respectfully requests that this Court exercise its discretion to uphold the release order issued by Judge Nolan.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Terence F. MacCarthy
Executive Director


By: s/Alison Siegler
    Alison Siegler

ALISON SIEGLER
FEDERAL DEFENDER PROGRAM
55 East Monroe Street
Room 2800
Chicago, IL 60603
(312) 621-8350

**CERTIFICATE OF SERVICE**

      The undersigned, Alison Siegler , an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**DEFENDANT'S MOTION FOR CLARIFICATION OF BOND**

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on April 7, 2008, to counsel/parties that are non-ECF filers.


      By:    s/Alison Siegler
            ALISON SIEGLER
            FEDERAL DEFENDER PROGRAM
            55 E. Monroe St., Suite 2800
            Chicago, Illinois 60603
            (312) 621-8350