IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 08 CR 153 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| PAUL PORTER ) | |
| ) | |

# ATTACHMENT

# Transcript of Detention Hearing - March 6, 2008

1  TRANSCRIBED FROM DIGITAL RECORDING

2              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
3                      EASTERN DIVISION

4  UNITED STATES OF AMERICA,         )
                                     )
5            Plaintiff,               )
                                     )
6       vs.                           )   No. 08 CR 153
                                     )
7  PAUL PORTER,                       )   Chicago, Illinois
                                     )   March 6, 2008
8            Defendant.               )   10:23 A.M.

9       TRANSCRIPT OF PROCEEDINGS - Detention Hearing
      BEFORE THE HONORABLE NAN R. NOLAN, Magistrate Judge

10 APPEARANCES:

11

12 For the Government:        HON. PATRICK J. FITZGERALD
                              219 South Dearborn Street
13                            Chicago, Illinois  60604
                              BY:  MS. MAUREEN MERIN
14
   For the Defendant:         FEDERAL DEFENDER PROGRAM
15                            55 East Monroe Street
                              Suite 2800
16                            Chicago, Illinois  60603
                              BY:  MS. ALLISON MARLOWE SIEGLER
17
   ALSO PRESENT:              MS. AMANDA A. POPP
18                            U.S. Pretrial Services

19
                    PAMELA S. WARREN, CSR, RPR
20                    Official Court Reporter
                    219 South Dearborn Street
21                          Room 1928
                      Chicago, Illinois   60604
22                       (312) 294-8907

23 NOTE:  Please notify of correct speaker identification.
   FAILURE TO STAND NEAR THE MICROPHONE MAKES PORTIONS
24 UNINTELLIGIBLE.

25

```
 1        (Proceedings held in open court:)
 2        THE CLERK:  08 CR 153, USA versus Porter.
 3        MS. MERIN:  Good morning, your Honor.  Maureen Merin
 4  on behalf of the United States.
 5        THE COURT:  Okay.  Hi, Ms. Merin.
 6        MS. SIEGLER:  Good morning, your Honor.  Allison
 7  Siegler from the Federal Defender Program appearing on behalf
 8  of Mr. Porter, who is present.
 9        THE COURT:  Okay.
10        MS. POPP:  (Unintelligible).
11        THE COURT:  And Ms. Popp.
12        And good morning, Mr. -- wait.
13        Mr. Porter.  Good morning, Mr. Porter.
14        THE DEFENDANT:  Good morning.
15        THE COURT:  How are you feeling?
16        THE DEFENDANT:  Good.  A lot better.
17        THE COURT:  Are you getting your medicine?
18        THE DEFENDANT:  Yes, I am.
19        THE COURT:  Good.  Well, you look good.
20        THE DEFENDANT:  Thank you.
21        THE COURT:  So that's good.
22        We're back here for your continued initial
23  appearance.  At the initial appearance the government moved to
24  detain you.  When we had the hearing last week, I asked them if
25  they still continued to detain you.  So it is still their
```

```
 1  position that detention is appropriate.
 2          And at that time Ms. Popp was able to discuss the
 3  possibility of you going into a residential program.  So that's
 4  what we are back for today.
 5          So what has happened?
 6          MS. SIEGLER:  Your Honor, here's the situation.
 7  Mr. Porter was able to have a phone interview with Gateway, and
 8  they have actually accepted him.
 9          THE COURT:  Oh.
10          MS. SIEGLER:  The only problem is that they don't have
11  bed space right now.
12          THE COURT:  Okay.
13          MS. SIEGLER:  And they say it will be approximately
14  two weeks.
15          THE COURT:  Okay.
16          MS. SIEGLER:  They will know more about that this
17  afternoon.  But right now the most they could tell pretrial was
18  about two weeks.
19          THE COURT:  Okay.
20          MS. POPP:  That is correct, your Honor.
21          THE COURT:  Okay.  And which facility is it?
22          MS. SIEGLER:  I think it is the West Side one, your
23  Honor.
24          THE COURT:  The West Side?  Okay.
25          All right.  Ms. Merin, have you had any cases where
```

1 people have gone to Gateway?

2     MS. MERIN: I have not personally.

3     THE COURT: Okay.

4     MS. MERIN: I know there have been in the office. (Unintelligible) the release into Gateway not because we objected and withheld treatment for Mr. Porter but because this facility is not secure and it is not possible to do electronic monitoring. So the defendant could potentially walk away at any time.

10     THE COURT: That's true, he could. That's true.

11 But they are not allowed -- just so you also know, at least my experience, with Gateway is they are not allowed out at all.

14 Correct?

15     MS. POPP: Your Honor, I don't know the answer to that.

17     THE COURT: And the other thing is they are not even really allowed visitors for a while. They are -- you know, there is a lot of literature in addiction that the very beginning is just what's important for the person who is recovering is just they -- them, their counselor, and their group. I mean, he's really there. He is physically -- he has to be there.

24 You're right. You're right, it is a voluntary program.

5

1          Okay. I'm prepared to make some findings. But
2   Mr. Porter is not going to be released until he -- until there
3   is a bed.
4          Now what has happened in my other cases are Gateway
5   actually comes and picks them up. So it is not even a matter
6   of him getting there.
7          But let me make my findings. Okay? The matter comes
8   before the Court on the request of the government to detain
9   Mr. Paul Porter pending trial in this matter. In considering
10  that request, I am guided by several general principles.
11  First, at all times the defendant is entitled to the
12  presumption of innocence.
13         Nothing that takes place in this hearing nor that I
14  set forth in my findings is intended or should be construed to
15  affect that presumption; rather, the purpose of this hearing is
16  to determine whether or not withstanding that presumption of
17  innocence a defendant should be detained pending trial.
18         Second, under the Bail Reform Act, pretrial detention
19  is, quote, an exceptional step. Under the Act the defendant
20  must be released prior to trial unless a judicial officer finds
21  that no conditions or combination of conditions exist which
22  will reasonably assure the appearance of the defendant or which
23  will reasonably assure the safety of any other person in the
24  community.
25         The Act requires that the least restrictive conditions

be imposed that are necessary to provide those reasonable assurances.  However, if I cannot find any conditions that will reasonably assure the appearance of the defendant as required or the safety of persons in the community, then I am required by the Act to order the defendant held into custody.

In this case the government seeks to detain Mr. Porter on the grounds that the crime charged is one of violence and that he's a danger to the community.

Correct?

MS. MERIN:  That is correct, your Honor.

THE COURT:  And also -- are you actually arguing that he's a risk of flight?

MS. MERIN:  Yes, your Honor.  And that's based on his failure, previous failure to return from work release on a previous conviction which was (unintelligible).

THE COURT:  Okay.  And that he is risk of flight.

The government argues the defendant should be detained for both -- under both grounds under the statute.

When seeking detention, based upon risk of flight, the government must show by a preponderance of the evidence that no conditions or combination of conditions will reasonably assure the defendant's presence.

When seeking detention based upon danger to the community, the government has a higher burden.  It must show by clear and convincing evidence that no conditions or combination

1  of conditions will reasonably assure the safety of the
2  community.
3         Okay.  So let's go through, and I'll tell you what my
4  thinking is.  Okay.  So I have two pretrial service reports.
5         And in the first report it shows that Mr. Porter is a
6  39-year-old native of Chicago.  He has very significant family
7  ties here.  I don't know whether Mr. Porter's ever even been
8  outside of Chicago.
9         He has a long history of mental illness.  And it was
10 kind of a dual diagnosis also with some drug problems also.
11        At first glance you look at his criminal record, and
12 he has a very large number of arrests.  There is no doubt about
13 it.  Starting in 1986 and going all the way to 2000 to the
14 current.
15        Although there has been nothing from 2006 to 2008.
16        Most of these, the great majority of them, appear
17 misdemeanors, and they have been dismissed.
18        Mr. Porter apparently was just in an inpatient
19 program.  He told us here in court that he would like more
20 help.  He's diagnosed since he has been 17 with schizoaffective
21 bipolar disorder, which he does take his medication for.
22        So here is what I am confronted with right now.
23 He -- there is a presumption of innocence on this case.  We
24 have a new Supreme Court case that came down on December 10th,
25 Gull versus The United States in which I think is very

important now in the way of bond because district courts now can consider many mitigating things that they couldn't consider before under Booker.

I believe that because of our overcrowding and the limited facilities that we have got for pretrial, I don't think, we have got either in any of our pretrial facilities adequate mental health and drug care.

And so I'm confronted with here is a real possibility for Mr. Porter to receive some treatment right now. He very well may be serving a sentence in this case. And, honestly, what I'd really like is him to be in good shape to be able to do that.

So I think I have had experience with Gateway before. I would go to Gateway myself. I think it is a wonderful program. They follow up. They are very -- this is a real tough love program. This is nothing -- and if -- the way we're going to make this bond, Ms. Popp, is if he has one bit of program -- one bit of problem in the program he's coming back here.

This bond is a bond to go to Gateway. I mean, I have to make it an OR bond.

But I'm telling you, Mr. Porter, this is not a bond to be on the street, this is a bond to go to Gateway. And I want you to complete this program. Okay?

This is a real opportunity for you, sir. They are

```
 1  wonderful people there.
 2          MS. POPP:  Your Honor, pardon me --
 3          THE COURT:  Yes.
 4          MS. POPP:  -- for interrupting.
 5          I just want to make sure that the record is clear,
 6  with respect to (unintelligible) criminal history.
 7          He has spent some time in Seattle, Washington, as his
 8  criminal history reflects.  He has been outside of Chicago.
 9          And also between 2006 and 2008 he did spend 18 months
10  in IDOC custody as a result of two sentences in 2005 and 2002.
11          This is reflected on page 5 of the report.  And I make
12  these points only to make sure that (unintelligible).
13          THE COURT:  And I'm glad you did.  Okay?  I -- I
14  think -- I mean, I disagree with you on risk of flight.
15          I find in myself, I even think by preponderance of the
16  evidence, a person who has absolutely no funds, no way to go,
17  probably no resources to go, I think your argument, probably
18  because of his past history, I -- that's why I asked you.  I
19  thought you probably were more moving under danger to the
20  community.
21          The standard that I follow on danger to the community
22  is Judge Adelman's opinion in United States versus Hammond,
23  which is found at 204 F.Supp.2d.  And as we all know that -- I
24  mean, the basic problem here is I realize he has a couple prior
25  convictions.  Okay?  But a lot of people have that.
```

1   What's more startling when you look at him is the
2 number of prior arrests. And the reason that I commented on
3 that is that that could be driving. But as Judge Adelman in
4 this case says, I mean this is almost -- clear and convincing
5 evidence is almost beyond a reasonable doubt.
6   And the question is not are you right, the question is
7 is there an alternative. And I think -- I cannot detain
8 somebody if there is a reasonable solid alternative. And I
9 think that's what the standard is.
10   So for those reasons I am going to -- I'm going to set
11 a bond -- well, we can make it a $25,000 bond. I don't think
12 money really is the issue here either.
13   I mean, Mr. Porter, the whole thing is in your hands.
14 Now this could either not only, A, help you -- hopefully
15 personally, physically help you.
16   Number two, it could help you with this case. If you
17 blow it, your lawyer at the time with the case, if they indict
18 you, is going to have a hard time saying, give this fellow
19 another chance because basically we're giving you the chance
20 now.
21   Do you understand me, sir?
22   THE DEFENDANT: Yes, I do.
23   THE COURT: Okay.
24   So I want you to set it up. 25,000. And it is to go
25 to Gateway.

1    I'm going to put a status here.  I'd like a status in
2 30 days.
3    If Gateway does not allow him to come out, it is
4 fine.  Okay?  I mean, he doesn't have to come out of his
5 program to come.  I just want to make sure that we're doing
6 okay with this bond.
7    If they let him come to court, that's fine too.  But I
8 don't want to do anything to disrupt the treatment is what I am
9 saying.  Okay?
10    So it is 25,000 and every condition basically -- I
11 mean, all normal conditions.  But they are pretty -- it -- but
12 the biggest is when he is released from Gateway, he is to come
13 to court the next day.  That's what it is.  Okay?  That's one
14 of the conditions.
15    The day after release or -- unless it is a Saturday.
16 I mean, the first court day after release, in addition to the
17 status, because we're going to take a look at it and make sure
18 he's doing okay.
19    MS. MERIN:  Right.
20    THE COURT:  All right?
21    And, of course, report -- but he doesn't report while
22 he's at Gateway.  That's why I'm going to have to change the
23 bond a little bit because all of -- a lot of our normal stuff
24 can't apply while he's at Gateway.  But put it down there
25 anyway.

1       Yes.
2       MS. SIEGLER: Did your Honor want to have Ms. Mitchell, who is in the courtroom, be his third-party custodian, again, as some transition --
5       THE COURT: Yes.
6       MS. SIEGLER: -- from Gateway?
7       THE COURT: Yeah. I do.
8       MS. SIEGLER: Okay.
9       THE COURT: So can Ms. Mitchell come up? Is this our bus driver lady?
11      MS. SIEGLER: Yes.
12      THE COURT: Okay. Hi.
13      MS. SIEGLER: She is a very old friend of his. Has known him since childhood.
15      THE COURT: That's what I thought.
16      MS. SIEGLER: And is also --
17      THE COURT: Hi, Ms. Mitchell.
18      MS. MITCHELL: Yes.
19      MS. SIEGLER: -- the mother of one of his children.
20      MS. MITCHELL: Hi.
21      THE COURT: Thank you for coming again today.
22      So I would imagine after knowing Paul for so long he trusts you. This is a real opportunity for him. So you need to not only be the third-party custodian and help us, I want you to come to court on the days we're set up.

I don't think there is probably any visiting.  But as third-party custodian you have an independent duty to call Ms. Popp or whoever is going to be supervising this.  If you see that he is -- if you know he's doing something to violate this bond, you are promising me that you're going to let her know.

MS. MITCHELL:  Okay.

THE COURT:  It is for his best interests too because this is going to follow him all the way through a very serious case.  Okay?

Do you agree?

MS. MITCHELL:  Yes.

THE COURT:  Okay.  And then if you will come back.  When is 30 days?

THE CLERK:  April 8th.

THE COURT:  How is that for everybody?

(Discussion off the record.)

THE COURT:  Well, we'll do it convenient for you because this is just to -- are you on trial or you're away?

MS. MERIN:  No, I'm actually going to be in (unintelligible).

THE COURT:  Sure.  What day is that?

MS. MERIN:  That's a Monday.

THE COURT:  That's fine.

Wait.  What am I doing?

1   MS. MERIN: The Friday -- the week previous to that.
2   (Discussion off the record.)
3   THE COURT: Oh, I do? Oh, I do. All right.
4   (Discussion off the record.)
5   MS. SIEGLER: She's gone.
6   MS. MERIN: I'll be out from the 8th to the 17th.
7   If we could do it the previous week --
8   THE COURT: The Friday?
9   MS. MERIN: Thursday or Friday.
10   THE COURT: Friday. I'm back then too, Lynette.
11   Let's do Friday afternoon.
12   MS. SIEGLER: I'm --
13   THE COURT: And you're not here?
14   MS. SIEGLER: No, I'm available. I'm available.
15   THE COURT: Okay.
16   Friday?
17   THE CLERK: The 18th.
18   THE COURT: No, the Friday before.
19   THE CLERK: The 11th.
20   MS. SIEGLER: The 4th.
21   THE COURT: No, the 4th, I think.
22   THE CLERK: I'm sorry.
23   THE COURT: That's okay. We're fine. Right?
24   2:00 o'clock. Okay.
25   MS. SIEGLER: That works, your Honor.

```
 1              THE COURT:  Okay.  How is that for you, Ms. Popp?
 2              MS. POPP:  That will be fine, your Honor.
 3              THE COURT:  And you'll let us know.  You'll talk to
 4    Gateway before that and let us know.
 5              MS. POPP:  I think probably (unintelligible) call you
 6    and --
 7              THE COURT:  That's great.  Okay.
 8              Because, Mr. Porter, you can't be -- you're going to
 9    stay in custody until there is an actual bed space.  Gateway
10    comes physically, brings you over there.  They are very strict,
11    and you have got to obey all their conditions.  Okay?
12              MS. MERIN:  Your Honor, before Ms. Mitchell sits down
13    I just have to say (unintelligible) with respect to the bond,
14    $25,000.
15              THE COURT:  Right.
16              So you're also co-signing the bond here, Ms. Mitchell,
17    too.  Okay?
18              If he were to runaway you could be responsible for the
19    money.
20              MS. SIEGLER:  Your Honor, is that necessary?  I mean,
21    could we have her be the third-party custodian and not cosign
22    the bond?  Simply because that was not something I previously
23    discussed with her or --
24              THE COURT:  Well, then I don't think I would have -- I
25    had thought she was only the third-party custodian too.
```

1       MS. SIEGLER: I think those are two separate things.
2       THE COURT: Do you want -- I'll make it a different
3  bond if you want. I'm not going to ask a non-family member
4  to --
5       MS. MITCHELL: (Unintelligible)(unintelligible)
6  certain amount of responsibility because we are going to be
7  release to (unintelligible). I don't think he's going to
8  runaway.
9       THE COURT: Okay. How about 4500? Okay?
10      Well, 4500 you cosign the bond too. Okay?
11      Okay? And unless he runs -- Mr. Porter, you
12 understand what's going on here? If you runaway or you -- you
13 know, if you runaway, this poor lady is going to stuck to the
14 government for $4500. Okay?
15      THE DEFENDANT: I wouldn't do that.
16      THE COURT: Okay. Well, good. I'm glad you're
17 affirmatively saying it.
18      Okay. All right. You want to draw up all the papers,
19 and then we can start on the next hearing and -- so,
20 Mr. Porter, if they let you out on the 8th to come to court,
21 but you're in the midst of your treatment and you can't, your
22 appearance is waived. Your lawyer will be here. We'll have a
23 report from pretrial. And you're going to come the day after
24 you are released. You have got to come to court then.
25      Okay?

```
 1            THE DEFENDANT:  Yes.
 2            THE COURT:  So, Ms. Popp, will you help them with the
 3   language -- you'll write with how the language goes on this.
 4   Okay?
 5            Thank you.
 6            MS. SIEGLER:  Thank you, your Honor.
 7            MS. MERIN:  Thank you.
 8            THE DEFENDANT:  Thank you, your Honor.
 9            THE COURT:  You're welcome, Mr. Porter.
10            THE DEFENDANT:  (Unintelligible).
11            THE COURT:  Good luck to you.
12            MS. SIEGLER:  Your Honor, I'm sorry.  There is one
13   more little issue.
14            THE COURT:  Wait.  Hold on.  There is one more issue.
15            MS. SIEGLER:  One more issue.
16            It got lost in all of that.
17            Mr. Porter is in remission from thyroid cancer, and he
18   had some bad blood work that came out.  And he was supposed to
19   see an endocrinologist.  I suppose -- he was actually scheduled
20   to see somebody on March 3rd.  And of course because of his
21   case and his arrest he wasn't able to do that.
22            I was going to ask your Honor depending on how long he
23   was going to be at the MCC, to make sure the MCC got him to see
24   somebody.  But that probably won't happen in the next two
25   weeks.
```

```
 1            THE COURT: I don't think --
 2            MS. SIEGLER: So --
 3            THE COURT: So I actually think you should talk to
 4   Gateway about it.
 5            MS. SIEGLER: About this?
 6            THE COURT: Because they have -- one of the other
 7   things -- I mean, they do this dual diagnosis. They do both
 8   drug and they can figure out the psychotropic medicine. So
 9   maybe they can see someone there.
10            MS. SIEGLER: I'm sure. I'm sure they have a
11   medical --
12            THE COURT: Okay. Yeah.
13            MS. SIEGLER: And then one more thing. The MCC was
14   also -- is also not providing him with hemorrhoid medicine.
15            I don't know if there can be anything -- sort of ask
16   the MCC to --
17            THE COURT: Well, we can't order, but I can
18   say -- we can certainly put in the order if possible see the
19   doctor.
20            MS. SIEGLER: He has lost ten pounds since he's been
21   there, your Honor.
22            THE COURT: Okay.
23            MS. SIEGLER: So that's part of my concern.
24            THE COURT: Okay. We'll put it in the order. I don't
25   know whether it will help. Okay?
```

```
 1         MS. SIEGLER:  Thank you, your Honor.
 2         MS. MERIN:  Thank you, your Honor.
 3         THE COURT:  You're welcome.
 4         THE DEFENDANT:  Thank you very, very much.
 5         THE COURT:  I --
 6         THE DEFENDANT:  Thank you for everything.
 7         THE COURT:  You're welcome, Mr. Porter.  Just do it.
 8    (Which concluded the proceedings in the above-entitled
 9  matter.)
10
11                    C E R T I F I C A T E
12
13       I hereby certify that the foregoing is a transcript of
14  proceedings before the Honorable Nan R. Nolan on March 6,
15  2008.
16  DATED:  March 12, 2008, 2007        [signature]
```